IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-F-08-224 OWW |
| | ) | |
| | ) | MEMORANDUM DECISION AND |
| | ) | ORDER DENYING DEFENDANT GARY |
| Plaintiff, | ) | ERMOIAN'S MOTION TO DISMISS |
| | ) | SIXTEENTH COUNT OF SECOND |
| vs. | ) | SUPERSEDING INDICTMENT (Doc. |
| | ) | 185) |
| | ) | |
| ROBERT C. HOLLOWAY, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
|_____| ) | |

Before the Court is Defendant Gary L. Ermoian's motion to dismiss the Sixteenth Count of the Second Superseding Indictment.[1] The motion to dismiss is joined by Defendants Robert C. Holloway, and Stephen J. Johnson; however, these joinders do not specify any particular facts or argument that applies to these defendants.

A. **Sixteenth Count**.

_____

[1] At the time the motion was filed, the applicable count was the Seventeenth Count of the Superseding Indictment filed on November 25, 2008.

1

1  The Sixteenth Count charges Defendant Ermoian, and co-
2  defendants Robert C. Holloway, Joseph S. Tyler, David A. Swanson,
3  and Steven [sic] J. Johnson with conspiracy to obstruct justice
4  in violation of 15 U.S.C. § 1512(c)(2) and (k).  Swanson is
5  alleged to have been employed as a Sheriff-Bailiff with the
6  Stanislaus County Sheriff's Department; Ermoian is alleged to be
7  a private investigator in the Stanislaus County area and an
8  associate of Robert Holloway; Johnson is alleged to have been a
9  dog trainer who trained narcotics and bomb detection dogs
10 primarily for law enforcement and military use, who was uniquely
11 situated to obtain sensitive law enforcement information, and who
12 also performed dog search duties for Robert Holloway.  The
13 Sixteenth Count alleges that the Central Valley Gang Impact Task
14 Force (CVGIT) was a task force constituted of State and Federal
15 law enforcement agencies to combat gangs and organized crime in
16 the central San Joaquin Valley; that the FBI, the Modesto Police
17 Department, and the Stanislaus County District Attorney's Office
18 were members of CVGIT; that CVGIT was conducting an investigation
19 into a criminal enterprise known as the Holloway criminal
20 enterprise, consisting of Robert Holloway, Brent Holloway, Road
21 Dog Cycle, and individuals associated with Robert Holloway and
22 Road Dog Cycle; that CVGIT members were concerned about
23 information gathered during the investigation being disseminated
24 to those outside law enforcement and to those under
25 investigation; that such unauthorized dissemination impeded the
26 investigation by, including but not limited to, altering the

2

methods by which CVGIT conducted the investigation and causing CVGIT to lose its ability to utilize normal avenues of communication with other law enforcement agencies; and that it was part of the CVGIT investigation of the Holloway criminal enterprise that search warrants were being planned to be executed at various residences and businesses, including Road Dog Cycle. The Sixteenth Count alleges:

> 75.   On or about September 19, 2007, CVGIT sent out an Officer Safety Bulletin to various members of the law enforcement community.   The Officer Safety Bulletin used pictures taken at a gathering called 'The 11th Annual Burn-Out Party,' held at Road Dog Cycle, and described Road Dog Cycle to be a business that is friendly to outlaw motorcycle clubs.   The Officer Safety Bulletin described the various outlaw motorcycle clubs that were seen at Road Dog Cycle at the 'Burn-Out Party,' including, but not limited to, the Hells Angels, the Jus Brothers and the Alky Haulers.   The Officer Safety Bulletin further informed law enforcement what to look for if law enforcement encountered Hells Angels motorcycle club members or those that supported the Hells Angels.   Finally, the Officer Safety Bulletin stated that it contained confidential information, was intended for law enforcement purposes only, should not be disseminated to the public and any dissemination should be on a 'need to know basis' only.   Defendant DAVID A. SWANSON received a copy of said Officer Safety Bulletin.

The means and manner of the conspiracy are alleged in Paragraph 77:

> a.   Defendant DAVID A. SWANSON, in his capacity as a law enforcement officer with the Stanislaus County Sheriff's Department, came into possession of an Officer Safety Bulletin, dated September 18, 2007, which

contained law enforcement sensitive and
confidential information concerning law
enforcement's intelligence regarding Road Dog
Cycle and Robert Holloway.

b.  Defendant STEVEN J. JOHNSON, in his
capacity as a dog trainer working with law
enforcement, obtained sensitive law
enforcement information relating to law
enforcement's interest in defendant ROBERT C.
HOLLOWAY and Road Dog Cycle.

c.  Once informed of the possibility that
search warrants may be executed at Road Dog
Cycle, defendant JOSEPH S. TYLER, in his
capacity as a Deputy employed by the Merced
County Sheriff's Department, would assist
defendant ROBERT C. HOLLOWAY by checking
stolen motorcycle parts through law
enforcement databases and informing Defendant
ROBERT C. HOLLOWAY whether such parts were in
fact stolen, in an effort to assist defendant
ROBERT C. HOLLOWAY with the disposal of such
parts to keep them out of reach of law
enforcement.

d.  Defendants DAVID A. SWANSON and STEVEN J.
JOHNSON would relay the belief that law
enforcement was gathering intelligence on
defendant ROBERT C. HOLLOWAY and Road Dog
Cycle, to defendant GARY L. ERMOIAN, with the
intent that such information be relayed to
defendant ROBERT C. HOLLOWAY to impede the
investigation, or relayed such information
directly to defendant ROBERT C. HOLLOWAY for
the purpose of impeding the information.

e.  To further impede the investigation,
defendant GARY L. ERMOIAN would also consult
with defendant ROBERT C. HOLLOWAY on possible
law enforcement undercover agents that had
infiltrated the Holloway criminal enterprise.

The overt acts of the conspiracy are alleged in Paragraph 78 and
consist of a list of telephone calls.

In its brief in opposition to Defendant's motion, the United
States represents:

4

1    On September 20, 2007, at 8:48 a.m., Swanson,
     (while working at the Stanislaus County
2    Courthouse) called [Ermoian] to alert
     [Ermoian] to tell Bob Holloway to 'watch his
3    back,' and that search warrants may be
     executed soon at Holloway's business, Road
4    Dog Cycle.  This call was made the day
     Swanson received a confidential Officer
5    Safety Bulletin which described law
     enforcement's intelligence on Bob Holloway
6    and the fact that law enforcement had been
     monitoring Holloway's business.
7
     At 9:13 a.m., after he received the call from
8    Swanson, [Ermoian] placed a call to Holloway,
     stating that he had just received a phone
9    call, that his source told him that law
     enforcement was at his business taking
10   pictures, and that he is to 'watch his back.'
     [Ermoian] further told Holloway that
11   'something is going on' and that this
     information came from someone 'right in the
12   court system' and that 'law enforcement may
     be around trying to get some orders or
13   information from the judge.' [Ermoian]
     further tells Holloway that 'I was told that
14   you need to watch your back and be very
     careful, something's happening.'
15
     At 9:26 a.m., Holloway called his son, Brent,
16   at Brent's home.  Holloway told Brent that,
     'we'll probably get raided today.'  When
17   Brent asked why, Holloway stated, 'Gary
     Ermoian called me, somebody leaked some info
18   and it had to do with our party this weekend.
     They all got photographs of all the club
19   (Hells Angels) guys and ah, somebody's in the
     courthouse right now doing paperwork, which
20   could mean a search warrant.'  Holloway goes
     on to ask Brent, 'Can you think of anything
21   that we've gotten recently that's
     questionable at all?'  Brent replies, 'The
22   FXR frame.'  Holloway responds, 'It's already
     in the alley with a tag on it.  Ah yeah and I
23   told them yesterday to come pick that mother
     fucker up because I don't want it here.  I
24   don't like the looks of it.  But if they
     come, it's already tagged and sitting in the
25   alley.'

26   At 10:01 a.m., Holloway calls co-defendant

                           5

Merced County Sheriff's Deputy Joe Tyler. Holloway tells Tyler that, 'We just got a phone call that kind of indicated that we may be getting a visit from local law enforcement today or in the very near future.'  Tyler asks, 'What for?'  Holloway replies, 'Oh, you know the normal bullshit.  Somebody said something or you they [sic] did some surveillance and saw two motorcycles here and put two and two together and came up with sixteen and decided it's time for a search warrant or whatever ....'  Tyler asks, 'Who do you think?'  Holloway responds, 'I don't have a clue.  It doesn't make any difference. I just hope it's somebody we can talk to ... Anyway, I got one number of all the shit that I have here that I don't have any paperwork on that I'm concerned with ... I'd like to have it run just so I can have a leg up on this situation if it's bad ... Just trying to get a leg up on it.'

Tyler and Holloway discussed how Holloway received a motorcycle component without any paperwork.  Tyler would later go on to state that he would run the numbers on the component for Holloway to find out if it comes back stolen.

At 10:45 a.m., Tyler calls Holloway back and tells him the component had been reported stolen and possibly recovered in 1991 from the Livermore Police Department, and informs Holloway that it's not showing as stolen in the system 'right now,' and won't show up as stolen unless 'someone goes to the trouble to pull up the sixteen year old Livermore report.'

At 12:03 p.m., Lynette Petrie, an employee at Road Dog Cycle, is heard on the wiretap talking to an unknown female.  She tells the female that Road Dog Cycle is on 'alert' for a law enforcement raid - 'same old crap, just a different day at Road Dog.'  The female asks, 'What did you guys get raided for (in the past), drugs and guns?'  Petrie responds, 'Yeah, that'[s] what they tried to do.  It's still not happened since I worked here. We've always heard down the line that it was going to happen, and so everybody is on alert

and then it never happens, so who knows?'
The female asks, 'So, today is another alert?
It's kind of like a fire drill?'  Petrie
responds, 'Yeah, kind of like, except the
bells don't go off.'

At 12:36 p.m., co-defendant Johnson calls
Holloway and tells him to leave his business
right then and 'go to your friend on Tully
Road' (Ermoian).  Johnson tells Holloway to
'get out right now!'  He then tells Holloway
that he will see him in Modesto.

At 12:45 p.m., Holloway calls [Ermoian] to
relay information that a source of his
(Holloway's) had also told him something was
going on and to leave his business
immediately.  Holloway and [Ermoian] then
discuss the fact that [Ermoian's] source
(Swanson) and Holloway's source (Johnson)
both gave him (Holloway) information about
possible law enforcement action being
contemplated against Holloway and/or his
business.

At 1:22 p.m. that day, [Ermoian] and co-
defendant Johnson call Holloway from
[Ermoian's] office.  During that
conversation, Johnson can be heard relaying
to [Ermoian], to relay to Holloway, the
description of various vehicles that Johnson
states are law enforcement vehicles around
Holloway's business.  Holloway tells them he
is going to go by his business to see if law
enforcement is there.  In fact, there were no
law enforcement vehicles at Holloway's
business at the time.

At 1:51 p.m., Holloway calls [Ermoian] and
tells [Ermoian] that he went by the business
and did not detect any law enforcement
vehicles.  Holloway and [Ermoian] then
question whether Johnson's information was
reliable, however, they agree that the
information [Ermoian's] source (Swanson)
provided was probably reliable.  As Holloway
told [Ermoian], 'You know, your information
(from Swanson), I'm sure it's good.'

The next day, at 11:46 a.m., on September 21,
2007, Holloway and [Ermoian] talk again.

7

They talk once again about their two sources.
Holloway states, 'I wanted to get with you,
you know, just to pursue your end of it a
little bit further, you know, after I talked
to that other guy (Johnson) yesterday.  And,
I was beginning to think he was full of shit.
Now, I'm thinking maybe he is not so full of
shit.' [Ermoian] surmises that Johnson, being
a trainer of police dogs, got his information
'in that place doing the training (police dog
training with local law enforcement) that he
said he was doing when he overheard this
stuff.'

[Ermoian] goes on to explain: 'Well, yeah, I
mean where I got this from yesterday (from
Swanson), when I got that call yesterday
morning, I totally, that's totally legit and
I'll, and when we talk you'll know why.'

Holloway concludes, 'And, and a lot of it has
to do with well, you know, what there must be
something going on on his end (Johnson),
because I heard it from you, a reliable
source (speaking of Ermoian), who heard it
from a reliable source (speaking of Swanson),
independent from anything he (Johnson) would
say or do and that's what really fucking
scared me, you know?'

Law enforcement did not execute search
warrants at this time.  Search warrants were
executed in February, 2008 at Holloway's
business and residence.

B.   Application of Section 1512(c)(2) to Conduct Alleged
Against Defendants.

18 U.S.C. § 1512(c) provides:

Whoever corruptly -

(1) alters, destroys, mutilates, or conceals
a record, document, or other object, or
attempts to do so, with the intent to impair
the object's integrity or availability for
use in an official proceeding; or

(2) otherwise obstructs, influences, or
impedes any official proceeding, or attempts

8

1

2

           to do so,

           shall be fined under this title or imprisoned
           not more than 20 years, or both.

3

4

18 U.S.C. § 1512(k) provides that "[w]hoever conspires to commit

5

any offense under this section shall be subject to the same

6

penalties as those prescribed for the offense the commission of

7

which was the object of the conspiracy."  Section 1512(f)

8

provides that "an official proceeding need not be pending or

9

about to be instituted at the time of the offense" and "the

10

testimony, or the record, document, or other object need not be

11

admissible in evidence or free of a claim of privilege."  As used

12

in Section 1512, an "official proceeding" means "a proceeding

13

before a Federal Government agency which is authorized by law."

14

18 U.S.C. § 1515(a)(1)(C).  Section 1515(c) provides that "[t]his

15

chapter does not prohibit or punish the providing of lawful, bona

16

fide, legal representation services in connection with or

17

anticipation of an official proceeding."

18

      The parties do not discuss whether an FBI investigation into

19

suspected criminal activity is an "official proceeding" within

20

the meaning of Section 1515(a)(1)(C).  There is limited law

21

addressing this issue.  The inquiry focuses on whether an

22

investigation by a federal government agency is a "proceeding

23

before a Federal Government agency."  The other definitions of

24

"official proceeding" in Section 1515(a)(1) are a proceeding

25

before a judge or magistrate judge of a federal court or federal

26

grand jury; a proceeding before the Congress; and a proceeding

1   involving the business of insurance whose activities affect

2   interstate commerce before any insurance regulatory official or

3   agency or any agent or examiner appointed by such official or

4   agency to examine the affairs of any person engaged in the

5   business of insurance whose activities affect interstate

6   commerce.  None of these definitions apply.

7       *United States v. Cross*, 258 F.Supp.2d 432 (E.D.Va.2007),

8   addressed a defendant charged with witness tampering in violation

9   of Section 1512(b)(1).  Following the execution of state search

10  warrants for drugs and firearms at Antoine Goodman's residence, a

11  DEA agent interviewed Lewis on July 12, 2002.  Lewis told the DEA

12  agent about Goodman and Cross's involvement in drug dealings, and

13  initiated a DEA investigation.  On August 10, 2002 Cross

14  threatened to kill Lewis if she testified against Goodman and

15  assaulted her.  A federal indictment against Goodman was filed in

16  2003 and Goodman pleaded guilty.  The issue presented was whether

17  there was a federal nexus because Lewis was not a federal witness

18  and there were no federal proceedings which had matured at the

19  time Cross made the threats to Lewis.  The District Court

20  rejected Cross's argument because a federal DEA investigation was

21  underway when Cross threatened Lewis and the investigation did

22  culminate in federal drug charges against Goodman:

23             Under the statute, the federal proceeding
               need not be pending or about to be

24             instituted, § 1512(e), and state of mind need
               not be proven as to the federal character of

25             the proceedings, § 1512(f).  Therefore, as
               Lewis was a witness in a federal

26             investigation, which led to federal charges,

1
2
        the criteria are met for the charge of
        witness tampering under 18 U.S.C. §
        1512(b)(1).

3  *Id.* at 435.  *Cross* is authority that what happened here, an FBI

4  investigation which led to federal charges satisfies the

5  "official proceeding" requirement.

6      Section 1512(c) was added by Section 1102, Pub.L. 107-24, as

7  Title XI, Corporate Fraud Accountability Act of 2002, part of the

8  Sarbanes-Oxley Act of 2002.  Defendants argue that Section 1512,

9  captioned "Tampering with a witness, victim, or an informant,"

10 prohibits conduct directed at the tampering of witnesses and

11 evidence.  Defendants contend that Section 1512(c)(2),

12 characterized by Defendants as a "residual clause," must be

13 narrowly construed to prohibit only similar forms of corrupt

14 witness and evidence tampering.  Defendant Ermoian contends that

15 Section 1512(c)(2) should not be construed to apply to "the

16 actions of an investigator who simply relays information given to

17 him from confidential sources to his client involving a federal

18 investigation."  This is not all that is alleged.  Rather,

19 Ermoian is charged with the other named Defendants as

20 participating in a conspiracy to obstruct an official proceeding,

21 *i.e.,* the F.B.I. investigation of Defendants and Road Dog Cycle.

22     Defendants rely on *United States v. Aguilar*, 21 F.3d 1475

23 (9th Cir.1994), *aff'd in part and rev'd in part*, 515 U.S. 593

24 (1995), in arguing that Section 1512(c)(2) should be narrowly

25 construed,  In *Aguilar*, a federal judge was convicted of

26 obstruction of justice in violation of 18 U.S.C. § 1503.  Section

1503 pertains to influencing or injuring an officer, juror or witness in any court of the United States.  The dispute in *Aguilar* was over the portion of the statute imposing criminal penalties on any one who "corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or attempts to influence, obstruct or impede, the due administration of justice."  Rudy Tham was a former union official who had been convicted in 1980 of embezzlement in a trial presided over by Judge Weigel.  Tham sought to have his conviction overturned so he could resume participating in union activities.  Tham sought the assistance of attorney Edward Solomon and a friend, Abraham Chapman.  Chapman was married to Mrs. Kusack, a longtime friend of the Aguilar family, whose daughter had married Judge Aguilar's brother.

In an effort to enhance the chances for success of Tham's petition before Judge Weigel, Chapman arranged a meeting between Judge Aguilar and Solomon, at which Judge Aguilar reviewed the petition and advised requesting an evidentiary hearing.  After this meeting, Solomon and Chapman, at the urging of Tham, periodically called Judge Aguilar, asking him to check on the status of the petition and hearing.  Judge Aguilar complied with these requests.

The FBI, in the course of investigating Tham and Solomon on unrelated matters, learned of Tham's efforts to set aside his conviction and of the conversations Chapman and Solomon had with Judge Aguilar.  The FBI began an investigation into the events

regarding Tham's petition and the possible illegal attempt to influence Judge Weigel.  In the course of the FBI investigation of the possible attempt to influence Judge Weigel in ruling on Tham's petition, the FBI decided to interview Judge Aguilar to determine the extent of his involvement in the matter.  FBI agents asked Judge Aguilar questions about his involvement with Chapman and Solomon concerning Tham's petition.

In reversing Judge Aguilar's conviction, the Ninth Circuit interpreted Section 1503 as extending only to interference with a pending judicial proceeding and found interference with a government agency's investigation is insufficient.  21 F.3d at 1484.  There was no evidence that a grand jury had authorized or directed the FBI investigation or that the FBI agents had been subpoenaed to testify.  *Id*.  "The fact that the FBI investigation could result in producing evidence that might be presented to a grand jury is insufficient to constitute a violation of section 1503."  *Id*.  In construing the scope of Section 1503, the Ninth Circuit noted that in 1982, Congress enacted the Victim and Witness Protection Act, which removed all references to witnesses in Section 1503 and enacted a new Section 1512, addressed specifically to the influencing of witnesses, victims, and informants.  The Second Circuit and the Ninth Circuit disagreed whether the 1982 enactment of Section 1512 and the amendment to Section 1503 was intended to remove witnesses entirely from the scope of Section 1503.  *Id*. at 1484-1485.  In 1988, Congress obviated the conflict between the Second and Ninth Circuits by

amending Section 1512(b)(1) to add "corruptly persuades" to

knowing use of intimidation, physical force, or threats to

influence the testimony of any person in an official proceeding.

The Ninth Circuit ruled:

> The importance of the legislative history to this case is that in removing the conflict between the Ninth Circuit and the Second Circuit, Congress indicated what type of non-coercive conduct was meant to be proscribed with regard to witnesses.  It is conduct that '*corruptly persuades ... or attempts to do so*' in order to influence or prevent the testimony of any person in an official proceeding.
>
> In order to sustain a conviction under the omnibus clause of section 1503, it must be found that Judge Aguilar's actions 'corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede the due administration of justice.'  Congress's translation of this requirement as it pertains to witnesses, by its amendment to Section 1512, indicates that the conduct must involve a defendant who 'corruptly persuades ... or attempts to [persuade]' a witness so as to influence his testimony.
>
> *If a person sought to influence the testimony of a witness by bribery or extortion, this would clearly fall within the normally accepted meaning of corrupt.  Simply making a false statement to a potential witness is a far cry from any generally accepted meaning of 'corrupt influence' or 'corrupt persuasion.'  To place in contrast the type of conduct that would be corrupt influence, consider the following hypothetical fact situation: FBI agents go to a judge, state that they have done an investigation, and reveal certain facts that they intend to relate to a grand jury, which indicate that the judge had engaged in a conspiracy to influence another judge.  If the defendant judge appeals to them not to so testify*

14

*because it would harm his career, offers them a bribe not to testify, or threatens that he will see that they lose their jobs if they testify - that would amount to an attempt to corruptly influence the FBI agents to change their testimony.*

*There is no evidence that Judge Aguilar tried to tell the FBI how to testify, tried to persuade them not to testify, or tried to dissuade them from testifying as to what their investigation otherwise revealed.  The only evidence is that he made false and misleading statements to the FBI regarding his contacts with Chapman and Solomon.  This is very different from the other types of activities enumerated in section 1503.*

**There is a significant difference between making a false statement to a potential witness and trying to persuade a witness to change his or her testimony through threats, force, bribery, extortion or other means of corrupt persuasion.  Under our past case law, *only* section 1001 has ever covered simple false statements.  Prior to its 1988 amendment, section 1503 extended to persuading a witness to tell a false story ...; the amendment explicitly shifted the prohibition on such 'corrupt persuasion' of a witness to section 1512.  At no point, however, has this court interpreted either section 1503 or section 1512 as barring the making of a false and misleading statement to a potential grand jury witness.  Instead, Congress's use of the phrase 'or corruptly persuades' is consistent with our past case law, corroborating our reliance on that later statutory language as a guide to interpreting the pre-amendment section 1503.**

**Construing section 1503 so broadly as to cover making false and misleading statements to FBI agents would implicate the Fifth Amendment concerns underlying the exculpatory no doctrine of section 1001 ... Thus, interpreting section 1503 as overlapping with section 1001 would at the very least require us to engraft the exculpatory no doctrine onto section 1503.**

15

> *If 'corruptly influence' is extended to mean 'making false statements to a potential witness,' we will have expanded the statute far beyond its reasonable construction.  If for no other reason, the rule of lenity would preclude such construction ... [I]n interpreting a criminal statute, where there is possible ambiguity, the more lenient construction is required.*

*Id.* at 1485-1487.

The Supreme Court affirmed this aspect of the Ninth Circuit's ruling, holding: "We do not believe that uttering false statements to an investigating agent - and that seems to be all that was proved here - who might or might not testify before a grand jury is sufficient to make out a violation of the catchall provision of § 1503."  515 U.S. at 600.  There is no false statement to a witness or attempt to coerce a witness charged here.

Relying on the italicized portion of the Ninth Circuit's *Aguilar* opinion, Defendants argue that the Court must similarly, narrowly construe the "corruptly obstructs, influences, or impedes" language in Section 1512(c)(2):

> The charged conduct does not involve Ermoian either tampering with a witness or destroying evidence, the harms that § 1512 is designed to protect against.  Just as in *Aguilar*, there is no evidence that Ermoian tried to dissuade anyone from testifying or direct anyone to destroy evidence.  Thus, as the *Aguilar* Court concluded, interpreting § 1512 to cover Ermoian's conduct here would expand the statute 'far beyond its reasonable construction.'

The United States responds that *Aguilar* is not controlling because the Ninth Circuit was construing an entirely different

16

statute.   The United States also takes issue with Defendants'
contention that a violation of Section 1512(c) is limited to the
destruction of evidence or tampering with a witness, citing
*United States v. Plaskett*, 2008 WL 3833838 at *3 (D.Virgin
Islands 2007):

>            To sustain a conviction for obstruction of
>            justice under Section 1512(c)(2), the
>            government must prove: (1) that the defendant
>            knowingly; (2) corruptly obstructed,
>            influenced and impeded, or attempted to do
>            so; (3) an official proceeding.

While the official proceeding need not be pending or about to be
instituted at the time of the offense, such proceeding must have
been foreseen by the defendant. *Id.*  To prove the requisite
intent to obstruct, courts have required the government to prove
that there was a sufficient nexus between the obstructive conduct
and the official proceeding. *Id.* at * 4.  The endeavor must have
the natural and probable effect of interfering with the due
administration of justice. *United States v. Reich*, 479 F.3d 179,
185 (2nd Cir.), *cert. denied*, ___ U.S. ___, 128 S.Ct. 115 (2007).

       The United States contends that here, Defendants were
knowingly and wrongfully using sources in law enforcement to gain
access to confidential law enforcement information to discover,
impede and obstruct the criminal racketeering investigation of an
international stolen motorcycles and motorcycle parts criminal
enterprise, which dealt with outlaw motorcycle groups and
included extortionate credit dealings, all of which interfered
with, impeded, or obstructed the execution of search warrants by

tipping off Holloway and his business to facilitate the secreting

or destruction of evidence and to deter or frustrate the F.B.I.

investigation and obtaining of evidence.

Defendants also cite *Arthur Andersen LLP v. United States*,

544 U.S. 696 (2005), a conviction for violation of 18 U.S.C. §

1512(b)(2)(A) & (B) which provides: "Whoever knowingly uses

intimidation or physical force, threatens, or corruptly persuades

another person, or attempts to do so, or engages in misleading

conduct toward another person, with intent to ... cause or induce

any person to ... withhold testimony, or withhold a record,

document, or other object, from an official proceeding [or]

alter, destroy, mutilate, or conceal an object with intent to

impair the object's integrity or availability for use in an

official proceeding" shall be subject to criminal penalties.

The adequacy of the jury instructions concerning "knowingly ...

corruptly persuad[e]" another person "with intent to ... cause"

that person to "withhold" documents from or "alter" documents for

use in, an "official proceeding" were decided by the Supreme

Court.   The Supreme Court stated:

> 'We have traditionally exercised restraint in
> assessing the reach of a federal criminal
> statute, both out of deference to the
> prerogatives of Congress ... and out of
> concern that "a fair warning should be given
> to the world in language that the common
> world will understand, of what the law
> intends to do if a certain line is passed."
> ....
>
> Such restraint is particularly appropriate
> here, where the act underlying the conviction
> - 'persua[sion]' - is by itself innocuous.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

> Indeed, 'persuad[ing]' a person 'with intent to ... cause' that person to 'withhold' testimony or documents from a Government proceeding or Government official is not inherently malign.  Consider, for instance, a mother who suggests to her son that he invoke his right against compelled self-incrimination ... or a wife who persuades her husband not to disclose marital confidences ....
>
> Nor is it necessarily corrupt for an attorney to 'persuad[e]' a client 'with the intent to ... cause' that client to 'withhold' documents from the Government.  In *Upjohn Co. v. United States* ..., for example, we held that Upjohn was justified in withholding documents that were covered by the attorney-client privilege from the Internal Revenue Service ... No one would suggest that an attorney who 'persuade[d]' Upjohn to take that step acted wrongfully, even though he surely intended that his client keep those documents out of the IRS' hands.

*Id.* at 703-704.  The Supreme Court noted that document retention policies, which are created in part to keep certain information from getting into the hands of others, including the Government, are common in business and that it is not wrongful for a manager to instruct his employees to comply with a valid document retention policy under ordinary circumstances.  *Id.*  The Supreme Court rejected the Government's position that "knowingly" in Section 1512(b)(2)(A) & (B) does not modify "corruptly persuades:"

> It provides the *mens rea* - 'knowingly' - and then a list of acts - 'uses intimidation or physical force, threatens, or corruptly persuades.'

*Id.* at 705.  The Supreme Court construed the meaning of the terms

1   "knowingly" and "corruptly:"

2           Only persons conscious of wrongdoing can be
            said to 'knowingly ... corruptly persuad[e].'
3           And limiting criminality to persuaders
            conscious of their wrongdoing sensibly allows
4           § 1512(b) to reach only those with the level
            of 'culpability ... we usually require in
5           order to impose criminal liability.' ....

6   *Id.* at 706.   The jury instructions were found to be flawed:

7           The outer limits of this element need not be
            explored here because the jury instructions
8           at issue simply failed to convey the
            requisite consciousness of wrongdoing.
9           Indeed, it is striking how little culpability
            the instructions required.   For example, the
10          jury was told that, 'even if [petitioner]
            honestly and sincerely believed that its
11          conduct was lawful, you may find [petitioner]
            guilty.' ... The instructions also diluted
12          the meaning of 'corruptly' so that it covered
            innocent conduct ....

13
            The parties vigorously disputed how the jury
14          would be instructed on 'corruptly.'   The
            District Court based its instruction on the
15          definition of that term found in the Fifth
            Circuit Pattern Jury Instruction for § 1503.
16          This pattern instruction defined 'corruptly'
            as 'knowingly and dishonestly, with the
17          specific intent to subvert or undermine the
            integrity' of a proceeding ... The
18          Government, however, insisted on excluding
            'dishonestly' and adding the term 'impede' to
19          the phrase 'subvert or undermine.' ... The
            District Court agreed over petitioner's
20          objections, and the jury was told to convict
            if it found petitioner intended to 'subvert,
21          undermine, or impede' governmental
            factfinding by suggesting to its employees
22          that they enforce the document retention
            policy ....

23
            These changes were significant.   No longer
24          was any type of 'dishonest[y]' necessary to a
            finding of guilt, and it was enough for
25          petitioner to have simply 'impede[d]' the
            Government's factfinding ability.   As the
26          Government conceded at oral argument,

                            20

1    '"[i]mpede"' has broader connotations that
     '"subvert"' or even '"undermine"' ... and
2    many of these connotations do not incorporate
     any 'corrupt[ness]' at all.   The dictionary
3    defines 'impede' as 'to interfere with or get
     in the way of the progress of' or 'hold up'
4    or 'detract from.' ... By definition, anyone
     who innocently persuades another to withhold
5    information from the Government 'get[s] in
     the way of the progress of' the Government.
6    With regard to such innocent conduct, the
     'corruptly' instruction did no limiting work
7    whatsoever.

8    *Id.* at 706-707.   The jury instructions were also infirm because

9    they allowed the jury to believe that it did not have to find any

10   nexus between the "persuasion" to destroy documents and any

11   particular official proceeding.   *Id.* at 707.   "A 'knowingly ...

12   corrupt[t] persuade[r]' cannot be someone who persuades others to

13   shred documents under a document retention policy when he does

14   not have in contemplation any particular official proceeding in

15   which those documents might be material."   *Id.* at 707-708.

16        Defendant Ermoian invokes *Arthur Andersen* by referring to

17   the Supreme Court's examples of persuasion that are not

18   necessarily malignant and contends:

19        [C]riminalizing the conduct charged here
          would improperly impair entirely legitimate
20        attorney and investigator activities.   By
          definition, much of a criminal defense
21        attorney's job is to impair, influence, or
          impede a criminal prosecution, albeit in
22        lawful ways, such as filing motions, raising
          privileges, and collecting information that
23        could defeat the government's case.   An
          attorney who is hired to represent a client
24        with respect to a pending or potential
          criminal investigation must be able to
25        vigorously defend his or her client within
          the bounds of the law.   This necessarily
26        includes relaying information to the client

                                   21

or hiring an investigator to interview
witnesses, obtain records, and generally
gather information.  Criminalizing such
conduct as alleged here would impermissibly
chill vigorous and entirely appropriate
attorney and investigator activities.  Under
the Government's interpretation of § 1512,
for example, a corporate attorney may be
exposed to criminal liability for corruptly
influencing, impairing, or impeding a federal
investigation if the attorney informed the
corporations's CEO that the U.S. Attorney's
Office had begun a criminal investigation and
would soon be issuing subpoenas for its
employees to appear before the Grand Jury[.]
Isn't that what a good criminal defense
attorney is supposed to do?  But the
government's interpretation of § 1512(c)(2)
and (k) in this case puts the attorney at
undue risk of criminal prosecution.

Defendant Ermoian argues that he was "squarely within the law
when relaying information that was given to him as an
investigator about a potential government investigation to his
client."  He has also provided support from the California
Association of Licensed Investigators, echoing these concerns by
engaging in investigative, informational, and advisement
activities.  These concerns are misplaced as they do not address
the types of conduct here in dispute.

The United States argues that Ermoian's actions were not
"squarely within the law" and that he did not have a duty as a
private investigator to share the information he received from
Swanson with Holloway when Ermoian's alleged purpose was to use
confidential law enforcement information to thwart seizure of
evidence pursuant to search warrant or prevent implementation of
law enforcement activities to impede success of the investigation

by unlawful means:

> The evidence reveals that the defendant obtained what was obviously confidential law enforcement information from a corrupt source within law enforcement.  He was not ethically bound to share this information with Bob Holloway.  The defendant could have easily told Deputy Swanson to talk to Bob Holloway directly, or could have not shared this information at all, so as to not involve himself in the passing on of what is clearly confidential, sensitive law enforcement information from a corrupt source within law enforcement.

This distinguishes the legitimate concerns of the private investigator to inform and advise a client about a criminal investigation, from an investigator who joins a conspiracy to corruptly use law enforcement officers, law enforcement confidential information, with the purpose of thwarting the surprise element in search warrant service, the hiding or destruction of evidence to prevent seizure, and the wrongful use of confidential law enforcement data bases to whether parts or property are contraband to prevent its identification and seizure, or to access confidential law enforcement data bases to identify witnesses or others involved in targeted criminal activity.

Ermoian replies that a narrow construction of Section 1512(c)(2) is required by the cited authority and that his alleged conduct is not be within the reach of the statute:

> Ermoian did not advise Holloway to do anything unlawful, such as destroy or hide evidence.  Rather, even under the government's view of the facts ..., the government's allegations amount to nothing

23

more than vague suggestions to 'watch his back' and general surmising about possible search warrants and witnesses – not any suggestion to hide evidence.

Accepting Defendant's interpretation, arguably the government's theory is that Ermoian was a knowing participant assisting co-conspirators who were using unlawful means to destroy, secret, or put beyond the reach of law enforcement, evidence of Holloway's alleged criminal conduct of the stolen parts and motorcycle criminal enterprise.  Moreover, Ermoian was allegedly working in concert with corrupt law enforcement officers to access nonpublic law enforcement information and to help Holloway avoid detection, seizure of evidence, and to avoid or be prepared for any law enforcement raids or service of search warrants.

C.   <u>Section 1512(c)(2) Unconstitutionally Vague</u>.

Ermoian argues that Section 1512(c)(2) is unconstitutionally vague because the term "corruptly" fails to provide adequate notice that the facts charged against Ermoian constitute a criminal offense under Section 1512(c)(2) and (k); that these statutes are too vague to provide notice that it prohibits the relaying of information once it has been leaked by a court staff member or confidential source.

"[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."

24

*Connally v. General Construction Company*, 269 U.S. 385, 391 (1926).  A penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct it prohibits, and do so in a manner that does not invite arbitrary and discriminatory enforcement by which "policemen, prosecutors, and juries ... pursue their personal predilections. *Kolender v. Lawson*, 461 U.S. 352, 357-358 (1983).   "The standard for unconstitutional vagueness is whether the statute 'provide[s] a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Maldonado v. Morales*, 556 F.3d 1037, 1045 (9th Cir.2009).

To prove that Section 1512(c)(2) is unconstitutionally vague, Defendant must show that the statute "'(1) does not define the conduct that it prohibits with sufficient definiteness and (2) does not establish minimal guidelines to govern law enforcement.'" *United States v. Rodriguez*, 360 F.3d 949, 953 (9th Cir.), *cert. denied*, 543 U.S. 867 (2004).  Where a statute is challenged as unconstitutionally vague in a cause of action not involving the First Amendment, the Court must determine "'whether the statute is impermissibly vague *in the circumstances of this case.*'" *Id.*  The Supreme Court "has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea.*"  *Colautti v. Franklin*, 439 U.S. 379, 395 (1979); *see also United States v. Mussry*, 726 F.2d 1448, 1455 (9th Cir.),

*cert. denied sub nom. Singman v. United States*, 469 U.S. 855
(1984).

Defendant places primary reliance on *United States v.
Poindexter*, 951 F.2d 369 (D.C.Cir.1991), *cert. denied*, 506 U.S.
1021 (1992).  Poindexter was convicted of violating 18 U.S.C. §
1505, which provided:

> Whoever corruptly, or by threats or force, or
> by any threatening letter or communication
> influences, obstructs, or impedes or
> endeavors to influence, obstruct, or impede
> the due and proper administration of the law
> under which any pending proceeding is being
> had before any department or agency of the
> United States, or the due and proper exercise
> of the power of inquiry under which any
> inquiry or investigation is being had by
> either House, or any committee of either
> House or any joint committee of the Congress
> [¶] shall [be subject to criminal penalty].

*Poindexter* ruled that the term "corruptly" as used in Section
1505 "is too vague to provide constitutionally adequate notice
that it prohibits lying to Congress."   *Id.* at 379.  In so
ruling, the District of Columbia Circuit relied on the
definitions of "corrupt" and "corruptly" applied in *United States
v. North*, 910 F.2d 843 *(North I), modified,* 920 F.2d 940
(D.C.Cir.1990)*(North II)*:

> '[C]orruptly' is the adverbial form of the
> adjective 'corrupt,' which means 'depraved,
> evil: perverted into a state of moral
> weakness or wickedness ... of debased
> political morality; characterized by bribery,
> the selling of political favors, or other
> improper political or legal transactions or
> arrangements.  A 'corrupt' intent may also be
> defined as 'the intent to obtain an improper
> advantage for [one]self or someone else,
> inconsistent with official duty and the

26

1          rights of others.'

2  *North I* at 881-882.  The *Poindexter* Court then looked to the

3  legislative histories of Section 1503, 1505 and 1512, as well as

4  cases interpreting Section 1505, to determine whether these

5  provide a narrowing interpretation of the term "corruptly" to

6  provide adequate notice that it criminalized false and misleading

7  statements to Congress.  *Id*. at 379-386.  *Poindexter* concluded

8  that no such narrowing interpretation was provided by legislative

9  history or case law.

10        *Poindexter's* holding has been overturned by Congress's

11  enactment of 18 U.S.C. § 1515(b), which provides that

12  "corruptly," when used in the context of this statutory

13  provision, means "acting with an improper purpose, personally or

14  by influencing another, including making a false or misleading

15  statement, or withholding, concealing, altering, or destroying a

16  document or other information."  *United States v. Hassoun*, 477

17  F.Supp.2d 1210, 1226-1227 (S.D.Fla.2007).  In *United States v.*

18  *Shotts*, 145 F.2d 1289 (11th Cir.1998), the Eleventh Circuit read

19  *Poindexter* narrowly and refused to extend *Poindexter's* view of

20  Section 1505's "corruptly" to Section 1512(b): "We again decline

21  to extend *Poindexter* to another section of the obstruction-of-

22  justice statutes."  *Id*. at 1300; *see also United States v.*

23  *Brenson*, 104 F.3d 1267, 1280 (11th Cir.1997)(refusing to apply

24  *Poindexter* to "corruptly" in Section 1503).  The Ninth Circuit in

25  *Aguilar*, after describing conduct that falls within the normally

26  accepted meaning of corrupt, i.e. bribery or extortion of a

witness, and concluding that making a false statement to a

potential witness is not within any generally accepted meaning of

"corrupt influence" or "corrupt persuasion" for purposes of

Section 1503, referred to but did not apply *Poindexter*:

> We find *United States v. Poindexter* ... most helpful on this point.  In that case, the D.C. Circuit held that the term 'corruptly,' as used in 18 U.S.C. § 1505, was unconstitutionally vague as applied to Poindexter's false statements to Congress. The court's interpretation of section 1505 was based on Section 1503, since the language of section 1505, including its 'omnibus clause,' was borrowed from section 1503.
>
> The *Poindexter* court found that while the defendant's false statements violated section 1001, they were not obviously encompassed with section 1505's prohibition against corruptly influencing, obstructing or impeding a congressional inquiry.  The court found that the term corruptly - although 'at least as used in § 1503, ... is something more specific than simply 'any immoral method used to influence a proceeding," - did not give constitutionally sufficient notice that it prohibited false statements to Congress ... Our construction of section 1503 renders this constitutional inquiry unnecessary, but we note that the constitutional issue raised and decided in *Poindexter* is nearly identical to the issue that is present here and that we would be required to conduct the same analysis as the D.C. Circuit were we to construe the statute in the manner urged by the prosecution.

The United States correctly notes that this Court is not

bound by *Poindexter*, out-of-circuit authority.   Congress has

moved beyond *Poindexter* by explicitly defining "corruptly."   The

United States cites *United States v. Rasheed*,  663 F.2d 843, 852

(9th Cir.1981), *cert. denied sub nom., Phillips v. United States*,

454 U.S. 1157 (1982), where the Ninth Circuit defined the word "corruptly" used in Section 1503: "means that the act must be done with the purpose of obstructing justice." *Rasheed* explained:

> Using this definition of 'corruptly,' the destruction or concealment of documents can fall within the prohibition of the statute. This holding does no violence to our rule that the catch-all provision of section 1503 is limited by the prior specific prohibitions of the statute. The act of destroying or concealing subpoenaed documents is 'similar in nature,' ... to the enumerated acts. The destruction or concealment of subpoenaed documents results in the improper suppression of evidence, and thus the influencing, obstructing and impeding of judicial proceedings, just as much was does the intimidation of a witness.

*See also United States v. Laurins*, 857 F.2d 529, 536-537 (9th Cir.1988), *cert. denied*, 492 U.S. 906 (1989):

> The specific intent required for obstruction of justice under sections 1503 and 1505 is that defendant must have acted 'corruptly,' i.e., that the act must have been done with the purpose of obstructing justice ... Concealing documents falls within this definition.

*See also United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir.1984)(Section 1503 embraces conspiracy to obstruct justice by hiding a witness to prevent his appearance at trial).

Defendant replies that *Rasheed, Laurins,* and *Lester* all involve "conduct at the 'core' of the obstruction of justice statutes" and none "considered the form of conduct at issue here and none addressed whether the statute at issue was unconstitutionally vague" as applied to Ermoian's conduct.

1  Defendant asserts:

2          [I]t is circular logic to say ... that by
           defining the term 'corruptly' in other
3          contexts to mean for 'an evil or wicked
           purpose,' or that the act must be done for
4          the purpose of obstructing justice, clarifies
           the statute.  How does this definition
5          provide adequate guidance as to what is
           covered by section 1512(c)(2) in evaluating
6          conduct that is outside the accepted
           prohibitions against threatening, bribing, or
7          hiding witnesses, or concealing or destroying
           documentary evidence?  The statute is
8          insufficiently clear to provide notice of
           what is covered once one goes outside this
9          'core' obstruction behavior.

10      Here, corruptly, meaning an act done with the intent to

11 obstruct justice, applies to knowingly wrongful conduct in

12 wrongfully accessing and using confidential law enforcement

13 information, that is carried out to hide, destroy, or put

14 evidence beyond the reach of law enforcement conducting a

15 criminal investigation, by "tipping off" or warning a suspect

16 about search warrant proceedings or law enforcement raids or

17 investigations to prevent the law enforcement proceeding from

18 succeeding.  Although Ermoian argues Section 1512(c)(2) is

19 unconstitutionally vague as to his actions - all he did was call

20 Holloway and tell him "that his source told him that law

21 enforcement was at his business taking pictures, and that he is

22 to "watch his back;"  Ermoian also  told Holloway that "something

23 is going on" and that this information came from someone "right

24 in the court system" and that "law enforcement may be around

25 trying to get some orders or information from the judge." Ermoian

26 further told Holloway, "I was told that you need to watch your

30

back and be very careful, something's happening."  Where the client seeks counseling concerning criminal conduct, the crime-fraud exception to the attorney-client privilege arguably applies.  *See, e.g., In re Grand Jury Proceedings,* 87 F.3d 377, 381 (9th Cir.), *cert. denied sub nom. Corporation v. United States*, 519 U.S. 945 (1996).  If Ermoian's conduct is in knowing furtherance of a conspiracy to wrongfully access confidential law enforcement data bases to warn Holloway that stolen property needs to be removed, hidden or destroyed to avoid detection or seizure, the requisite corrupt purpose to impede an official proceeding, a F.B.I. investigation, is present.

> D.   <u>Attorney-Client and Work Product Privileges</u>.

Ermoian argues that Count Sixteen must be dismissed because his conduct consists of making and receiving phone calls that are protected by the attorney-client and work product privileges.

The United States contends that there is an issue whether Ermoian, "as a private investigator not retained by the defendant [sic] on any particular case, holds a privilege with Robert Holloway:"

> The defendant has not shown to the court any agreement between himself and Mr. Holloway, or any agreement between Mr. Holloway and any attorney under whom the defendant worked, that covers the time period in question and the investigation in question.  The defendant has cited to no case in which communications of a private investigator, separate and apart from an attorney communication with a client, are privileged.

Ermoian responds by referring to allegations in the

31

affidavit of FBI Agent Elias in support of the search warrant,
No. 08-SW-00027 OWW, filed on July 31, 2008, where Elias
described Ermoian as a private investigator who is "working for
the criminal defense attorney who represents Bob Holloway."  He
refers to Agent Elias' declaration in connection with a report of
a stolen motorcycle in August 2005 that attorney Kirk McAllister
told Stanislaus County Sheriff's Detective Joe Knittel that "his
investigator, Gary Ermoian" had possession of and would return
the motorcycle.  Ermoian finally refers to Agent Elias' testimony
at the hearing on the motion to revoke the detention order
conducted on September 10, 2008, that Ermoian is "a private
investigator that works for several different defense attorneys
in Stanislaus County.  And we have received information that –
through the course of our investigation and supported by the
wiretaps that Mr. Ermoian was a private investigator who
conducted work on behalf of Mr. Holloway and/or Mr. Holloway's
legal representation."  Ermoian argues that, after consistently
taking the position that Ermoian was acting as a private
investigator through attorney Kirk McAllister when the government
applied for and obtained a number of search warrants and wiretap
orders, the United States should be estopped from taking an
inconsistent position by arguing here that there was no attorney-
client relationship.  To the extent the Court believes it
necessary, Ermoian is prepared to establish an attorney-client
relationship at an evidentiary hearing on this motion.

     Determining whether judicial estoppel should be invoked is

32

1  informed by several factors: (1) whether a party adopts a

2  position clearly inconsistent with its earlier position; (2)

3  whether the court accepted the party's earlier position; and (3)

4  whether the party would gain an unfair advantage or impose an

5  unfair detriment on the opposing party if not estopped.  *New*

6  *Hampshire v. Maine*, 532 U.S. 742, 750-751 (2001).  Judicial

7  estoppel does not apply.  It is Ermoian's burden to show that his

8  communications with Holloway at issue were privileged.  Although

9  the search warrant is sealed, it does not appear that Agent Elias

10  averred that Ermoian was retained by Mr. McAllister at the time

11  of the alleged telephone calls.  There is no unfair advantage to

12  the United States nor a detriment to Ermoian, as he says he can

13  prove that his contacts with Holloway at the time at issue were

14  subject to attorney-client relationship and has now offered his

15  declaration on this subject.

16       The United States further argues that the client, Robert

17  Holloway, waived any privilege by revealing the contents of his

18  conversation with Ermoian to third parties, i.e., Brent Holloway,

19  Joe Tyler, and Steve Johnson.  The United States cites *United*

20  *States v. Tellier*, 255 F.2d 441, 447 (9th Cir.), *cert. denied*,

21  358 U.S. 821 (1958):

22                It is of the essence of the attorney-client
                privilege that it is limited to those
23                communications which are intended to be
                confidential ... Thus it is well established
24                that communications between an attorney and
                his client, though made privately, are not
25                privileged if it was understood that the
                information communicated in the conversation
26                was to be conveyed to others.

33

1  Ermoian responds that "the purpose of the calls in question was

2  to report on information learned from others, an unquestionable

3  purpose of legitimate investigator activities."   Ermoian cites

4  *Upjohn Co. v. United States*, 449 U.S. 333 (1981) and *United*

5  *States v. Rowe*, 96 F.3d 1294, 1297 (1996).   In *Rowe*, the Ninth

6  Circuit held that "[w]hat [*Upjohn*] did do is make clear that

7  fact-finding which pertains to legal advice counts as

8  'professional legal services.'"   Ermoian contends that "it is

9  too much of a reach to argue that Ermoian knew the information he

10  discussed with Holloway would be conveyed to third-parties

11  outside the scope of the attorney-client privilege."

12       One of the telephone calls between Ermoian and Holloway

13  occurred in Ermoian's office in the presence of Johnson.   The

14  presence of a third party defeats the confidentiality requirement

15  of the privilege.

16       The United States contends that there can be no colorable

17  argument made that the communications between Ermoian and

18  Holloway discussing leaks in a criminal investigation and how to

19  elude the impact of a search warrant are communications to obtain

20  "informed legal advice."   The crime-fraud exception prevents

21  legal advice, counseling or furthering criminal or fraudulent

22  activity.   Ermoian disagrees.   Referring to the declaration of

23  Mark J. Reichel, Ermoian contends:

24              Ermoian's relaying of information he obtained
            from others about a potential government
25              investigation is certainly within the
            boundaries of providing professional legal
26              services.   Ermoian's and Holloway's

> speculation that a search warrant may have
> been issued or that agents were in the
> process of searching the premises is what
> [sic] one of a wide range of actions
> attorneys and investigators routinely discuss
> their clients ... Attorneys often advise
> clients on what to do if and when agents
> arrive with a search warrant ... Such
> discussions are not unlawful and
> criminalizing them would chill entirely
> appropriate legal defense activity.

This presents an issue of intent as to the corrupt purpose that is for the jury to resolve, once the separate issue of the privilege claim is resolved.  The charged conduct is not privileged as a matter of law.

Ermoian contends that Count 16 must be dismissed because his alleged conduct is protected by the work product privilege.  The work product privilege protects information prepared in anticipation of litigation or for trial or for another party or its representative.  The purpose of the privilege is to give parties freedom and incentive to develop their own cases and to prevent exploitation of a party's efforts in preparing for litigation.  *See Moreno v. Autozone, Inc.,* 2008 WL 906510 at *1 (N.D.Cal.2008).  Whether Ermoian's conversations with Holloway are subject to the work product privilege is an issue that depends on resolution of disputed facts.

<u>CONCLUSION</u>

For all the reasons stated: Defendant Ermoian's motion to dismss the Sixteenth Count of the Second Superseding Indictment is DENIED.

///

35

1    IT IS SO ORDERED.

2    **Dated:    November 19, 2009**                        **/s/ Oliver W. Wanger**
                                              UNITED STATES DISTRICT JUDGE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26